# LIBERTY MUTUAL INSURANCE COMPANY
## *v.* STATE FARM AUTOMOBILE INSURANCE COMPANY ET AL.

[No. 407, September Term, 1970.]

*Decided June 2, 1971.*

306

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, SINGLEY and SMITH, JJ.

*Donald L. Merriman,* with whom were *Merriman, Crowther & Merriman* on the brief, for appellant.

*John B. Howard,* with whom were *Cook, Mudd, Murray & Howard* on the brief, for appellees.

BARNES, J., delivered the opinion of the Court.

The principal issue in this appeal is in regard to the proper construction of the two automobile liability insurance policies of the appellant and cross-appellee, Liberty Mutual Insurance Company (Liberty Mutual), and of State Farm Automobile Insurance Company (State Farm), one of the appellees and cross-appellants, as the provisions of these policies relate to the obligations between the respective liability insurance companies for

amounts paid by State Farm in settlement of claims for personal injuries and property damage resulting from an automobile accident which occurred on December 30, 1966, on York Road near Ensor Avenue in Baltimore County.

The basic facts are not in dispute. When the accident occurred, the insured, Phillip D. Sacratini (Sacratini or the insured), was an employee of the Tilo Company, a home improvement corporation which was a subsidiary of Reynolds Metals Company. Liberty Mutual had issued, for a number of years, a liability policy in which it insured Reynolds Metals and certain of its subsidiaries, including the Tilo Company. Tilo had, in turn, issued certificates of coverage to certain of its key employees, making each, by express endorsement, a named insured. Sacratini was such a named insured under the Liberty Mutual policy in regard to his ownership, maintenance, operation and use of a 1963 Cadillac automobile.

The Liberty Mutual policy had limits of $100,000 for each occurrence in regard to injury and $5,000 in regard to property damage. The policy was in effect from January 1, 1966, through January 1, 1967.

Sacratini was also a named insured under the terms of a policy of automobile liability insurance issued by State Farm the morning of the accident—December 30, 1966 —which covered a 1966 Chevrolet automobile which had been acquired by Sacratini some two months earlier by trading his 1963 Cadillac. The record does not disclose that Liberty Mutual was advised of the newly acquired 1966 Chevrolet prior to the happening of the accident. Sacratini reported the accident to both Liberty Mutual and State Farm.

Sacratini had been employed by the Tilo Company as the Branch Manager of the Baltimore office located in Timonium. Prior to the accident, the Tilo Company closed its office in Virginia, transferred its Virginia Branch Manager to the Baltimore office as a consequence of which Sacratini was demoted to Assistant Branch Manager with a reduction in compensation. Sacratini was dissatis-

fied with his new position and planned to leave his employment with the Tilo Company. He testified that he knew that as a Branch Manager of the Tilo Company, he was provided with the protection of a policy of automobile insurance but that no such protection was afforded for Assistant Branch Managers. He also had traded his 1963 Cadillac, scheduled in the Liberty Mutual policy, for a 1966 Chevrolet in October 1966 and testified that the financial institution through which he financed the purchase of the 1966 Chevrolet, required—and he also desired—collision insurance (the Liberty Mutual policy had neither collision nor comprehensive coverage), so that he applied for and received a binder for a new automobile insurance policy from State Farm containing both collision and comprehensive coverage covering his newly acquired 1966 Chevrolet. This new policy provided the insured with limits of $15,000 for each person and $30,000 for each occurrence as to injury and $5,000 as to property damage. As already indicated, there is no dispute that the new policy was in effect at the time of the accident.

After the accident, the claims personnel of both Liberty Mutual and State Farm began an investigation of the accident. Sacratini was sued by claimants named Pitkin and Fisher for damages resulting from Sacratini's alleged negligence. For approximately two years after the accident, the two insurance companies negotiated in regard to which company should respond to the risk. State Farm admitted it had a valid and operative insurance policy, but that Liberty Mutual was a co-insurer, and, as such, should participate in the defense and payment of the claims arising out of the accident. Liberty Mutual, on the other hand, contended that its policy would not respond in that there was an escape clause abrogating coverage if there was other valid and collectible insurance. No attempt was made during the discussions to implead or involve the Tilo Company. State Farm undertook the defense of the claims, without prejudice to its position in regard to Liberty Mutual, kept Liberty Mu-

tual fully advised concerning the progress of the cases, sending copies of all relevant pleadings and particulars, and continuously invited Liberty Mutual to participate. The Pitkin and Fisher claims had been fully developed and evaluated by State Farm and its counsel by September 1969. Settlement figures of $7,500 for personal injury and $525 for property damage were agreed upon in the Pitkin case and of $10,000 in the Fisher personal injury case. These settlement figures were submitted to Liberty Mutual for its approval and that company, with the benefit of all background material, agreed that the amounts of the proposed settlements were fair and reasonable, but adhered to its position that there was no coverage under its policy.

On August 12, 1969, State Farm filed a petition for declaratory relief (later amended on March 30, 1970) in the Circuit Court for Baltimore County seeking a declaration that Liberty Mutual should reimburse State Farm for that proportion of the total sum paid by State Farm in the settlements which should be equal to the proportion to which the limits of the Liberty Mutual policy bear to the total limit of liability of the policies of both State Farm and Liberty Mutual and that Liberty Mutual should reimburse State Farm for a proportionate share of the costs incurred by State Farm in the defense of the Pitkin and Fisher lawsuits. Liberty Mutual in its answer maintained its position that there was no coverage under its policy.

At the conclusion of the testimony before Judge Proctor, an oral opinion was rendered indicating that Liberty Mutual was liable on a pro rata basis for the amounts paid in settlement of the Pitkin and Fisher lawsuits and for 50% of the costs in defending those cases. By an order, filed October 7, 1970, this opinion was effectuated by the entry of judgment of $13,724.03 in favor of State Farm against Liberty Mutual as the latter's pro rata liability in the settlement of the cases and for $2,165.50 representing 50% of the fees and costs incurred by State Farm in defense of the cases and the prosecu-

tion of the declaratory judgment proceedings. Liberty Mutual took a timely appeal to this Court from the judgments entered. State Farm also took a timely cross-appeal from the judgments in order to challenge before us the alleged error of the trial court in its method of appor-. tioning the legal fees and costs. Inasmuch as we have concluded that there was no liability under the Liberty Mutual policy, we shall reverse the judgments below without considering the question raised by the cross-appeal.

The specific provisions of the Liberty Mutual policy will now be considered.

The Liberty Mutual policy contains a "Family Automobile Coverage" endorsement, Form 1450 A, which contains the controlling provisions of the policy so far as the present case is concerned.

Paragraph 6 of the endorsements provides in relevant part as follows:

> "6. In Insuring Agreement IV of the policy, division (a), 'Automobile,' and division (b), 'Private Passenger Automobile,' are replaced by the following:
> "Automobile. The word 'automobile' means:
> "Owned Automobile
>> "(a) a private passenger, farm or utility automobile described in this policy for which a specific premium charge indicates that coverage is afforded,
>> "(b) a trailer owned by the named insured,
>> "(c) a private passenger, farm or utility automobile ownership of which is acquired by the named insured during the policy period, provided
>>> "(1) it replaces an owned automobile as defined in (a) above, or
>>> "(2) the company insures all private passenger, farm and utility automobiles owned by the named insured on the date of such ac-

quisition and the named insured notifies the company during the policy period or within 30 days after the date of such acquisition of his election to make this and no other policy issued by the company applicable to such automobile, or * * *"

Then follow other definitions of "Private Passenger Automobile," of "Farm Automobile," of "Utility Automobile," of "Trailer" and of "Automobile Business."

Paragraph 7 provides for reimbursement of the insured for transportation expenses incurred during the period commencing 48 hours after the theft of an entire automobile covered by the policy has been reported to the police, with a limit of $10.00 a day and a total of $300.00.

Then comes paragraph 8 which *replaces the Exclusions* in the policy (except exclusions (d), (j), (l) and (q)), not involved in the present case. It then provides in relevant part:

"(i) under coverages A and B, to the ownership, maintenance, operation, use, loading or unloading of an automobile ownership of which is acquired by the named insured during the policy period or any temporary substitute automobile therefor, if the named insured has purchased other automobile liability insurance applicable to such automobile for which a specific premium charge has been made; * * *"

It is apparent that the 1966 Chevrolet was *acquired* by the named insured (Sacratini) in October 1966—during the Liberty Mutual policy period—and that the named insured had purchased other automobile liability insurance from State Farm for the 1966 Chevrolet for which a specific premium charge had been made. In short, the factual situation in the present case fits precisely with-

in the language of the paragraph 8 exclusion from liability, unless some other provisions of the policy modify or change the meaning and effect of the paragraph 8 exclusion.

The lower court was of the opinion that the definitions in paragraph 6, already set forth, did modify or make ambiguous the provisions of the paragraph 8 exclusion on the theory that in the paragraph 6 definition it is provided that a private passenger automobile is one the ownership of which is "acquired" by the named insured during the policy period, *provided* it *"replaces"* an owned automobile as defined in (a) above, so that the definition includes both acquisition and replacement whereas the paragraph 8 exclusion only uses the word "acquired" but not the word "replacement" or "replaces." The trial court quoted from the Psalms that "The Lord giveth and the Lord hath taken away" and expressed the opinion (in which we concur) that this did not apply to automobile liability insurance policies. The lower court, however, concluded that Liberty Mutual could not confer coverage in one part of the policy and take it away at another part of the policy. We do not concur in this conclusion, however, inasmuch (1) almost all liability policies do just that by conferring broad coverage in the first part of the policy only to narrow that broad coverage by exclusions, conditions, etc., later in the policy and (2) we find no conflict between the provisions of paragraphs 6 and 8, as properly construed.

The provision in paragraph 6 (c) (1) in requiring that the automobile *acquired* by the named insured during the policy period "replace" the owned automobile defined in (a) is a limitation in the definition to prevent the coverage of vehicles acquired by the insured in *addition to the* vehicle covered by the policy for which Liberty Mutual would not have been paid a premium or perhaps not be aware of their existence as a possible source of liability. Paragraph 8 excludes liability for a vehicle acquired by the named insured *if* the insured *has purchased other automobile liability insurance* applicable to

such automobile for which a specific permium has been charged. This exclusion is to prevent an overinsurance of an insured vehicle by the named insured and excludes coverage when the named insured purchases and looks to another policy for protection. The two provisions can reasonably be construed together to mean that if a named insured acquires another automobile during the policy period which does not replace the covered automobile, there is no liability because of the definition in paragraph 6 regardless of whether other liability insurance has been purchased; and if he acquires another vehicle during the policy period and obtains other insurance covering that vehicle, liability is excluded by the provisions of paragraph 8, even if the acquired vehicle does replace a covered automobile. In summary, the provisions of paragraph 6, as properly construed, do not modify or make ambiguous the provisions of paragraph 8, which provisions are clear and unambiguous and clearly apply to facts in the case at bar.

The Liberty Mutual policy is a contract and the intention of the parties is to be discovered primarily by the language used in the policy itself. *Shillman v. Hobstetter,* 249 Md. 678, 688, 241 A. 2d 570 (1968). If that language is clear and unambiguous, there is no need to invoke the secondary rules of construction used by the Courts when the language is ambiguous. *Schapiro v. Jefferson,* 203 Md. 372, 378, 100 A. 2d 794 (1953).

Our construction of the provisions of paragraph 8 is in accord with our decision in *Consolidated Insurance Co. v. Bankers Insurance Co.,* 244 Md. 392, 223 A. 2d 594 (1966), where we pointed out that:

" 'Other insurance' clauses were originated in the property insurance field in order to protect the insurer from the 'moral hazard' resulting from the over-insurance of property. These clauses sought to discourage intentionally and fraudulently inflicted self-injury to the insured's property, and received ready enforcement by

the courts. Although the 'moral hazard' of over-insurance is not present in the liability field, 'other insurance' clauses in this area of the law are neither invalid nor unconscionable and also have met with uniform judicial recognition.

"Three general types of 'other insurance' clauses commonly appear in modern automobile liability policies: (1) the *escape* clause, whereby the policy is declared not to cover the insured in a double coverage situation; (2) the *excess* clause, whereby the insurer declares itself liable up to the limits of its policy only for the excess amount, if any, necessary to indemnify the insured after the other insurer has paid to the full limit of its coverage; (3) the *pro-rata* clause, whereby the insurer obligates itself for a ratable share of the loss in the same proportion which the limit of its own policy coverage bears to the aggregate total coverage protecting the insured."

(244 Md. at 395-96)

The provisions of paragraph 8 constitute an "escape" clause and, as such, were intended by the parties to exclude coverage in a double coverage situation.

See *Couch on Insurance* 2d, Section 45:182 at p. 233:

"[T]he so-called 'automatic insurance' clauses generally read as follows: 'Automatic Insurance For Newly Acquired Automobiles.' If the named Insured who is the owner of the automobile acquires ownership of another automobile, such insurance as is afforded by this policy applies also to such other automobile as of the date of its delivery to him, subject to the following additional conditions: (1) if the Company insures all automobiles owned by the named Insured at the date of such delivery, insurance applies to such other automobile, if it is used for pleasure purposes or in the business of the named In-

sured as expressed in the declarations, but only to the extent applicable to all such previously owned automobiles; (2) if the Company does not insure all automobiles owned by the named insured at the date of such delivery, insurance applies to such other automobile, if it replaces an automobile described in this policy and may be classified for the purpose of use stated in the policy, but only to the extent applicable to the replaced automobile; (3) the insurance afforded by this policy automatically terminates upon the replaced automobile at the date of such delivery; and (4) this agreement does not apply (a) *to any loss against which the named Insured has other valid and collectible insurance,* nor (b) unless the named insured notifies the Company within ten days following the date of delivery of such other automobile, nor (c) except during the policy period, but if the date of delivery of such other automobile is prior to the effective date of this policy the insurance applies as of the effective date of this policy, nor (d) unless the named insured pays any additional premium required because of the application of this insurance to the said automobile."

(Emphasis supplied.)

In *Continental Casualty Co. v. Weekes,* 74 So. 2d 367 (Fla. 1954), one Parnell was operating an automobile owned by Acme when the vehicle was involved in an accident. Acme was insured by the Continental Casualty Company, the policy providing under Section 3, that:

"(b) The insurance does not apply:"

\* \* \*

"(4) to any liability for such loss as is covered on a primary, contributory, excess, or any other basis by insurance in another insurance company."

Parnell was insured personally by Aetna Casualty and Surety Company and, although he was covered by the policy while driving other automobiles, the policy also provided that the coverage should be "excess insurance over any other valid and collectible insurance available" to him. The trial court, in considering whether the Continental policy constituted "other valid and collectible insurance" within the meaning of Aetna's policy, held that Continental was liable to the extent of its policy limits for all amounts the plaintiffs in the negligence actions might recover and gave no effect to clause 3 (b) (4) of Continental's policy. The Supreme Court of Florida reversed this decision and, in sustaining Section 3 (b) (4), the escape clause of Continental's policy, stated:

> "Our search of the authorities has convinced us that only two cases which are sufficiently close in their policy provisions to render them highly persuasive have been decided on the point before us. The cases are *Penn. v. National Union Indemnity Co.*, 5 Cir., 68 F. 2d 567, and *McFarland v. Chicago Express, Inc.*, 7 Cir., 200 F. 2d 5. In each case the liability of the insurer or insurers, if any, arose out of a single set of circumstances, as here, and in each case one of the policies, but not the other, contained language importing that no coverage would exist thereunder if other coverage were provided. The respective courts in both cases gave full effect to this language."

The Florida Supreme Court then stated:

> "It will be noted that the language of the Employer's policy provided that it should be 'null and void', while here the Continental policy states that 'this insurance does not apply', but the effect of the two clauses under these facts was the same, and we consider this distinction to be insignificant here. Moreover, the Employ-

er's policy provided contingent liability for excess insurance, while Continental's policy does not; therefore, if the Employer's policy was not 'valid and collectible insurance' within the meaning of the policy of the lessee's insurer, a fortiori, Continental's policy is not. As a matter of construction, clause 3(b) (4) of Continental's policy should have been enforced by the trial Court, and we so hold."

The Florida Supreme Court continued:

"It remains to consider whether or not this clause is contrary to public policy or to law, *Penn. v. National Union Indemnity Co., supra,* 68 F. 2d 567. There is no basis in the record before us for the conclusion that public policy will be violated by the enforcement of clause 3(b) (4), although we cannot and do not hold that this will be true in every case. For aught that appears here, sufficient financial responsibility is provided for the protection of the public, and this is nothing more than a contest between insurance companies."

When the Florida Supreme Court considered the public interest and the Florida financial responsibility laws, the Court concluded:

"The ordinance plainly intends to protect the public from financial irresponsibility. As we observed at the beginning of this opinion, there is no doubt that Continental's policy would have covered Parnell had it not been for the insurance provided by Aetna, and it is not contended that the Aetna coverage is insufficient in amount to comply with the ordinance. It appears that the coverage contemplated by the ordinance is satisfied and the public protected within its terms." (74 So. 2d 368-69)

See also *Continental Casualty Co. v. Suttenfield,* 236 F. 2d 433 (5th Cir. 1956) ; *Allstate Insurance Co. v. Shelby Mutual Insurance Co.,* 269 N. C. 341, 152 S.E.2d 436 (1967) ; *Government Employees Insurance Co. v. Globe Indemnity Co.,* 415 S.W.2d 581 (Ky. 1967) ; *American Employer's Insurance Co. v. Liberty Mutual Insurance Co.,* 93 N. H. 101, 36 A. 2d 284 (1944) ; *Employer's Liability Assurance Corp. v. Liberty Mutual Insurance Co.,* 84 Ohio Law Abstract 58, 167 N.E.2d 142 (1959) ; and, *St. Paul Fire & Marine Insurance Co. v. Westmoreland,* 105 S.W.2d 203 (Tex. Comm. of App., Sec. B 1937).

It may be added that the suggestion that Condition 18, "Other Insurance" of the Liberty Mutual policy, presents an ambiguity when read in the light of the exclusion in paragraph 8 (i) of the endorsement is unsound. When the exclusion operated to eliminate coverage under the policy, Condition 18 which only applies to a "loss covered by the policy" could not apply.

Nor is the inclusion of the exclusion in paragraph 8 (i) in the Liberty Mutual policy contrary to any statutory provision. No prohibition of such an escape clause is contained in Maryland Code (1970 Repl. Vol.), Art. 66½, § 7-324 and such clauses are in regular use in the insurance field as we observed in *Consolidated Mutual Insurance Co. v. Bankers Insurance Co.,* 244 Md. 392, 223 A. 2d 594 (1966), *supra.*

Finally, it should be observed that the present case is a controversy between two liability insurance companies in regard to the liability *between themselves* for the damages resulting to the injured members of the public and does not involve any rights of such injured persons under either policy. The purposes set forth in Art. 66½, § 7-324 et seq., of the Maryland Code (the Act of 1943, Ch. 1007, as amended) are in no way involved in the controversy between the two liability insurance companies.

Liberty Mutual, for the reasons stated, is not liable to State Farm for any part of the damages arising from the accident of December 30, 1966, and was under no obligation to defend or contribute to the cost of the defense

or settlement of the resulting actions by those injured and damaged. Liberty Mutual's motion to dismiss should have been granted by the lower court and the judgments entered on October 7, 1970, against Liberty Mutual in favor of State Farm must be reversed.

In view of our decision that the judgments should be reversed, it is not necessary to consider the alleged error of the trial court in assessing the damages raised by State Farm in its cross-appeal.

> *Judgments reversed, the appellee State Farm Automobile Insurance Company to pay the costs.*