BRADLEY, Judge.
Insurer, Alabama Farm Bureau Mutual Casualty Insurance Company, appeals from an adverse judgment rendered by the Circuit Court of Autauga County entitling the plaintiff-insured to recovery of a sum found to be due under the “automatic insurance” provisions of a certain automobile insurance policy, and awarding an additional sum as punitive damages for the fraudulent conduct of the insurer.
Farm Bureau’s principal contentions on appeal are that coverage under the automatic insurance provisions of the policy was terminated by the insured’s son’s application for another automobile insurance policy, and that no evidence sufficient to sustain a finding of fraud on the part of the insurer was presented to the trial court. We affirm.
This appeal arises out of the following facts. The insured, Mr. William Clyde Ware, owned several automobiles, all of which were insured by defendant insurer. One of these vehicles, a 1976 Ford Elite, was used by Mr. Ware’s twenty year old son, Al, in whose name the certificate of title was issued. The collision and liability insurance coverage for this car, as well as for all the family vehicles, had been purchased from Farm Bureau by Al’s parents.
Certain portions of the policy on Al’s car (policy no. A661914) read as follows:
Newly Acquired Automobile — means an automobile, ownership of which is acquired by the named insured if (1) it replaces an automobile owned by the named insured and covered by this policy, or the Company insures every automobile owned by the named insured on the date of its delivery, and (2) the named insured notifies the Company, applies for such insurance, and pays the premium required because of the application of the insurance to such newly acquired automobile, all within thirty days following the delivery date of such newly acquired automobile.

13. . . .

(a) The insurance with respect to a newly acquired automobile shall not apply to any liability or loss against which the insured has other collectible insurance applicable thereto in whole or in part.

in WITNESS WHEREOF, the ALABAMA FARM BUREAU MUTUAL *1242 CASUALTY INSURANCE COMPANY, INC., has caused this policy to be signed by its President and Secretary, but the same shall not be binding upon the Company unless the Declarations made a part hereof, is countersigned by a duly authorized officer or representative of the Company. [Emphasis added.]
On or about August 17,1977 Al, using his and his parents’ funds, purchased a Datsun 260-Z automobile to be used as a replacement for the Ford Elite. Because Mr. Ware’s job often necessitated his absence from home, Mrs. Ware initiated efforts to have the new Datsun insured.
Mrs. Ware contacted the Farm Bureau office in Prattville on August 23, 1977 and discussed coverage for the Datsun with agent Henry Hattemer and Martha De-Busk, a Farm Bureau employee. At that time some discussion was had regarding whether coverage for this particular high-performance Datsun vehicle could be provided by Farm Bureau, or whether the car would have to be listed with Farm Bureau’s rated company, Federated Guaranty Mutual Insurance Company. (Federated Guaranty is a separate corporation from Alabama Farm Bureau on paper only, and exists solely for the purpose of insuring high risk persons and automobiles. Both companies are operated by the same officers and employees using the same offices, equipment, etc.) The insurer’s employees also requested certain information about the car which Mrs. Ware was unable to provide. Mrs. Ware stated she would contact them again to supply this information. She did not make application for insurance at this time.
Two days later Mrs. Ware contacted Mr. Hattemer again to give him the requested information and to inquire further about possible coverage for the Datsun with Farm Bureau. She indicated that she desired the same coverage as the family had on their other vehicles, i. e. “full coverage.” Mr. Hattemer stated that he would draw up a proposal and meet with her to discuss the matter. He also told her that his company would need to have a photograph of the Datsun.
On September 2,1977 Mr. Hattemer visited Mrs. Ware at her office in the county courthouse. A co-worker of Mrs. Ware, Linda Buckner, was present during much, if not all, of the discussion between Mr. Hat-temer and Mrs. Ware. The proposal sheet presented to Mrs. Ware by Mr. Hattemer indicated that the premium for six months’ coverage for the Datsun would be $471.70, $197.80 of which represented the premium for liability coverage only.
According to Mr. Hattemer’s testimony, when he left Mrs. Ware’s office that afternoon he had no doubt that she desired liability coverage only for the Datsun. However, Mrs. Ware testified that she was “shocked” at the amount of the premium for full coverage and that the meeting concluded without any agreement having been reached. She told Mr. Hattemer that she had instructed her son to drive the Datsun back down to Prattville from Tuscaloosa where Al attended college, in order to have pictures made of the car, and that she would talk further with Mr. Hattemer about insuring the car.
Mrs. Ware then called her husband, who was in Cullman at the time. He told her that they “didn’t operate with part coverage on anything,” but that the proposed premium was too high and she should shop around. On that same day Mrs. Ware obtained price quotations for full coverage from other insurers. She also called the Farm Bureau office and requested Mrs. De-Busk to have Al call her when he arrived there from Tuscaloosa.
Mrs. Buckner’s testimony confirmed that no agreement concerning insurance for the Datsun was reached between Mrs. Ware and Mr. Hattemer during the discussion in Mrs. Ware’s office, and that after Mr. Hat-temer left the office Mrs. Ware continued to make inquiries with other insurance companies.
Mrs. Ware’s son, Al, testified that after purchasing the car he had taken it back to Tuscaloosa and that he had used the car at school. His mother had telephoned him at about 7:00 a. m. on Friday morning, September 2, 1977, and had instructed him to *1243 drive the car down to the Farm Bureau office that afternoon to have a picture of the car taken. Mrs. Ware had instructed him neither to buy insurance nor to sign any application. A1 arrived at the office late that afternoon, having driven directly from Tuscaloosa, and told Mrs. DeBusk that he was there to have the picture made. Mrs. DeBusk saw that the photograph was taken and elicited information from A1 concerning the car, his driving record, etc.
A1 told Mrs. DeBusk that he had a friend waiting in the car and was in a hurry to go to a football game that night. Mrs. De-Busk told A1 to sign some papers. A1 testified that he signed the papers, not knowing what they were at the time, in the belief that by doing so he would not have to make another trip home from college “if we decided to get insurance” from Farm Bureau. Mrs. DeBusk quoted no premiums to him, nor did he pay her any money. A1 testified that she told him that the Datsun was covered until September 17th (thirty days after the purchase date). A1 then went home and related to his mother the events that had occurred at the Farm Bureau office that afternoon. The next day Mrs. Ware called the office to find out what A1 had signed, but the office was closed on Saturday.
Mrs. DeBusk testified that she was instructed by Mr. Hattemer to see that a picture of the car was taken and to get A1 to sign the application. She stated that she did not discuss with A1 the kind of coverage for which the application provided, nor the amount of the premium; and, that she was sure A1 knew he was signing an application, but that A1 apparently did not know he was supposed to sign an application that day because he “fussed” about having to come back inside the office to do so.
The application signed by A1 remained in the Farm Bureau office until Tuesday September 6th, the day after Labor Day, at which time Mrs. DeBusk filled in the rates and signed Mr. Hattemer’s name to the application. The effective date of coverage stated in the application is September 2, 1977. The application indicates that there is no damage to the Datsun and that the insured, A1 Ware, is to be billed for the premium.
However, prior to the time the application was sent to Farm Bureau’s home office in Montgomery, plaintiff personally appeared at the Farm Bureau office in Pratt-ville. Mr. Ware testified that after being reassured that he still had insurance on Al’s Datsun, he informed the insurer’s employees that during the previous weekend A1 had been involved in a one-car accident and had “totaled” the Datsun. He gave them some of the information necessary for filing a claim. In her testimony Mrs. DeBusk denied telling Mr. Ware that morning that the Datsun was still covered. She testified that after receiving this information about the accident she made no changes in the application bearing Al’s signature.
Later that day the application was sent to Farm Bureau’s home office where it was received on September 8, 1977 and countersigned by a Farm Bureau officer the following day. The policy issued on the basis of the application, Federated Guaranty Policy No. G123427, was received by the Wares on September 13,1977. The policy provided for liability coverage only. The Wares were billed $194 for the premium on this policy, but this premium was never paid.
Late in September 1977, the Wares were informed that their claim under the newly acquired automobile provisions of policy number A661914 was being denied. This denial of coverage was based on the insurer’s position that the automatic insurance coverage terminated as of September 2, 1977, “[b]ecause the application [signed by Al] had been made and coverage specified that the applicant wanted [liability only.]”
Mr. Ware filed a two count complaint, alleging in count one that Farm Bureau owed him the amount due under the automatic insurance provisions of the Farm Bureau policy. He also alleged in count two that the Federated Guaranty policy had been fraudulently issued in an attempt to avoid his claim and that the insurer had tortiously failed to settle his claim.
After hearing the evidence ore tenus the trial court issued a judgment in favor of the *1244 insured in the amount of $5,179.72, that being the amount of loss less the deductible amount under the terms of the insurance contract. The insured was also awarded $2,589.86 as punitive damages for the fraudulent conduct of the insurer.
The pertinent issue to be decided in this appeal is the point in time at which the automatic insurance for the Datsun under the Farm Bureau policy terminated. Farm Bureau argues that coverage under the automatic insurance provisions in the Farm Bureau policy terminated upon Al’s application for the Federated Guaranty policy, citing Liberty Mutual Insurance Company v. State Farm Automobile Insurance Company, 262 Md. 305, 277 A.2d 603 (1971); Cook v. Suburban Casualty Co., 54 Ill.App.2d 190, 203 N.E.2d 748 (1964); and 7 Blashfield Automobile Law and Practice § 316.3 (3d Ed. 1966). However, even if the assumption is made that Al’s signature on the application constituted a bona fide application for insurance, a reading of these authorities indicates that automatic insurance coverage terminates when other specific insurance is purchased and the newly-acquired automobile becomes described in the new policy.
In the instant case the Federated Guaranty policy was not introduced into evidence. Thus it is uncertain whether the Federated Guaranty policy contained a provision similar to the above-quoted section 13(a) of the Farm Bureau policy, stating that the policy shall not be binding upon the insurer until the declarations made a part thereof are countersigned by the insurer’s officer. Portions of the record — specifically the testimony of Jane Adams, assistant vice-president of auto underwriting, who was in part responsible for the decision to deny the Ware’s, claim — tend to indicate that the Federated Guaranty policy did contain such a provision.
Nevertheless, the law in this state is that an application for insurance is a mere proposal by the applicant, which must be accepted by the insurer as made before there is a meeting of minds and thereby a resulting contract. Life Insurance Company of Georgia v. Miller, 292 Ala. 525, 296 So.2d 900 (1974) and cases cited therein. The testimony reveals that the Federated Guaranty policy was countersigned and issued on September 9, 1977, approximately six days after the accident and three days after the insurer had notice thereof. Consequently, the Federated Guaranty policy did not constitute “other collectible insurance” which, under § 13(a) of the Farm Bureau policy, would terminate the automatic insurance coverage.
The insurer argues that in order for the automatic insurance provisions to apply, the insured must comply with that provision of the policy requiring notice to the insurer of acquisition of the new vehicle and payment of any additional premium required, citing Southern Guaranty Insurance Co. v. Wales, 283 Ala. 493, 218 So.2d 822 (1969). In the Wales case the trial court erroneously found that a newly-acquired truck was covered by the automatic insurance provisions of a policy, where the policy had been renewed twice subsequent to the acquisition of the truck but the insured had failed to notify the insurer until after the loss had occurred.
In the instant case the insurer was timely notified of the acquisition of the Datsun. The testimony of Jane Adams, the Farm Bureau officer, indicated that it was the insurer’s practice to determine the amount due as the additional premium for the automatic insurance coverage and then bill its customers for this amount, rather than requiring such payment at the time notice to the insurer is given. However, no such bill was ever sent to the Wares. The only premium notice they received was the bill for $194 on the Federated Guaranty policy. Thus, Farm Bureau’s argument is that no coverage existed under the automatic insurance provisions because the Wares failed to pay a premium for which they were never billed and the amount of which was unknown to them. We are unable to agree with this reasoning.
Farm Bureau’s other principal ground for appeal is the trial court’s finding that the insurer fraudulently refused to pay Ware’s claim. It argues that no evidence of fraud *1245 on its part was adduced at trial, and cites Old Southern Life Insurance Co. v. Woodall, 295 Ala. 235, 326 So.2d 726 (1976), for the proposition that a finding of fraud must be based on proof that there existed an intention not to honor a claim when the policy was issued.
We think the record amply supports the trial court’s finding of fraudulent conduct by Farm Bureau. As both parties to this appeal point out, Black’s Law Dictionary 788 (4th Ed. rev. 1968) defines “fraud” as follows:
An intentional perversion of truth for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to him or to surrender a legal right; a false representation of a matter of fact, whether by words or by conduct, by false or misleading allegations, or by concealment of that which should have been disclosed, which deceives and is intended to deceive another so that he shall act upon it to his legal injury.
Farm Bureau’s ex post facto issuance of the Federated Guaranty policy, on the basis of an “application,” the validity of which is, at best, questionable, and with knowledge that the liability “coverage” thereunder was virtually worthless from the date of issuance forward, could properly have been viewed by the trial court as a fraudulent attempt to avoid payment of Ware’s valid claim.
The proposition for which Old Southern Life is cited is inapplicable to the case at bar. That case involved the denial oí claims under a single hospitalization insurance policy. The insurer was alleged to have induced the insured to purchase an insurance policy by fraudulently representing that claims under the policy would be paid. In the case at bar, however, the fraud complained of does not involve the representations made at the time of the purchase of the Farm Bureau policy, but rather the issuance of the Federated Guaranty policy which the insurer attempted to use as a shield to avoid liability under the Farm Bureau policy.
There being no reversible error, this case is affirmed.
AFFIRMED.
WRIGHT, P. J., and HOLMES, J., concur.